# Exhibit "A"



# DIGITAL TOUCHPOINTS ARE MAKING THEIR MARK IN U.S. RETAIL, BUT PRINT IS (STILL) NOT DEAD

DIGITAL  | 12-18-2017

Technology has redefined the ways we communicate, read, bank, listen and shop. In fact, U.S. adults now spend more than three hours a day using the internet and apps via computers and smartphones. That usage represents double-digit growth from last year.

Despite this digital revolution, fast-moving consumer goods (FMCG) retailers have long found that the printed circular—the flyer that promotes a local store's latest products and specials—has the farthest reach for marketing. According to a 2017 Nielsen Homescan study, about 80% of U.S. households still use circulars and other traditional, printed sources for product information. Looking at usage over the past three years, printed flyers have declined only slightly in popularity, down 3-4 percentage points since 2014.

Meanwhile, retailers' digital marketing touchpoints (e.g., websites, mobile apps, social media, emails, text messages and blogs) are starting to make their mark. Unsurprisingly, store websites and emails are the most-used digital channels, reaching 77% and 75% of households, respectively. Based on current trends, Nielsen predicts that more U.S. households will be using these touchpoints than traditional touchpoints by 2019.

But store websites and emails aren't the only important channels for digital engagement. At least 50% of U.S. households use store apps, social media and money-saving apps, and these touchpoints experienced double-digit growth between 2014 and 2017. Millennials have the highest usage rates across all digital touchpoints, and Generation X households have the highest new adoption rates.



# SHOPPER ENGAGEMENT WITH MARKETING TOUCHPOINTS



Source: Nielsen, Homescan Survey fielded Aug 2017; Chg vs 2014; Question – Do you look at information about products and sales available at stores from the following sources?

Copyright © 2017 The Nielsen Company (US), LLC. All Rights Reserved.

## ABOUT 80% OF U.S. HOUSEHOLDS STILL USE CIRCULARS AND OTHER TRADITIONAL, PRINTED SOURCES FOR PRODUCT INFORMATION

Tweet

Even as consumers embrace digital channels for retailer marketing, traditional touchpoints won't vanish any time soon. In a 2017 Nielsen Homescan study, almost half of U.S. households said they use at least eight different sources (across print and digital) to get information about products and sales. Printed circulars are still alive and well as an important source of information, while digital marketing serves to complement customer engagement.

Given these dynamics, retailers can best reach their shoppers by leveraging multiple touchpoints for marketing. They should maintain and optimize spending on traditional circulars, since these will continue to be shoppers' main source of information for the near term. And as consumers seek more information digitally, it's critical that retailers develop and enhance their digital marketing touchpoints. Across generations, they should appeal to Millennials using digital platforms, but also broaden digital penetration among Generation X and Baby Boomers, who are adopting these touchpoints quickly.

Tagged:   SHOPPER   |   CPG AND RETAIL   |   E-COMMERCE   |   BRAND MARKETING   |   GROCERY

http://www.nielsen.com/us/en/insights/news/2017/digital-touchpoints-are-making-their-mark-in-us-retail.html

# Exhibit "B"

## ADLIFE DIGITAL FOOD PHOTOGRAPHY DISTRIBUTOR AGREEMENT

AGREEMENT made this __8th__ day of __June__, 1994 by and between MULTI-AD SERVICES, INC., hereinafter referred to as "Distributor", with its principal place of business at 1720 West Detweiller Dr., Peoria, Illinois 61614 and ADLIFE MARKETING AND COMMUNICATIONS CO., INC., hereinafter referred to as "Developer" with its principal offices at 555 University Avenue, Norwood, MA 02062.

WHEREAS, Developer produces digital food photos (hereinafter referred to as "digital photos") suitable for remarketing on CD-ROM disc by Distributor;

WHEREAS, Distributor desires to market the digital photos produced by Developer on CD-ROM disc to be distributed on an updated CD-ROM disc every two (2) months to Distributor's customer base;

NOW THEREFORE, in consideration of the mutual promises contained herein, it is hereby agreed as follows:

### 1. License

### 1.1 Distribution Rights

During the term hereof, Developer grants to Distributor the non-exclusive world-wide right and license to market and distribute digital photos to be produced pursuant hereto by Developer as required hereunder.  Developer will press a one off CD-ROM containing fifty (50) digital photos and deliver same to Distributor pursuant to Schedule 1 attached hereto and by this reference incorporated herein. Distributor may make modifications to Developer's one off CD-ROM, including but not limited to indexing and separating the photos into twenty-five (25) photos to

represent each month to remain consistent with Distributor's syndicated service, and such other modifications, as Distributor, in its sole discretion determines. Nothing herein shall be interpreted to preclude the Distributor from exercising any right or license to enter into a VAR, OEM, Telemarketing or other redistribution agreement or license with regard Developer's digital photos.

## 1.2 License to Use Trademark and Trade Name

Any and all trademarks and trade names which Developer uses in connection with the license granted hereunder are and shall remain the exclusive property of Developer. This Agreement gives Distributor no rights therein except for a limited license to reproduce trademarks and trade names as necessary for, and for the sole purpose of allowing, Distributor to fully promote and market the digital photos pursuant to the terms of this Agreement.

## 1.3 Competition by Distributor

Nothing in this Agreement shall impair Distributor's rights at all times to use or distribute, without obligation to Developer, similar ideas, digital photos, or computer products which have been, without infringement upon Developer's copyright or trade secrets, independently submitted by others to Distributor independently developed by Distributor, or which have become publicly known, whether before or after execution of this Agreement. Further, Distributor may procure, market, and distribute products and services at any time which may be competitive with Developer or with the digital photos produced by Developer or any other product sold by Developer.

### 1.4 Term

This Agreement shall continue in full force and effect from the date first above written, until March 1, 1999 and shall thereafter, be renewed for additional periods of one (1) year, unless terminated in writing by either party at least ninety (90) days prior to the end of the original term or any renewal term. Unless otherwise mutually agreed to in writing by both parties, the terms of any renewal term shall be the same as contained herein.

## 2. Service and Payment

### 2.1 Artwork

Developer agrees to provide Distributor with a one off CD-ROM containing fifty (50) digital food photos pursuant to the volume and delivery dates set forth on Schedule 1 and each CD-ROM shall contain a variety of different food groups to satisfy Distributor's reasonable market needs. Developer and Distributor will consult in good faith with regard the contents of digital photos to be contained in each one off CD-ROM delivered to Distributor hereunder. Developer and Distributor further agree to exercise good faith in order to develop certain standards with regard to the size, format, line screen and other conditions of the electronic files to ensure reasonable compatibility with Distributors CD-ROM requirements and to insure said files meet acceptable industry standards. Developer shall be responsible for all costs and freight incurred in the production and shipment of the one off CD-ROM containing the digital photo files to Distributor.

### 2.2 Terms of Payment

Distributor agrees to pay Developer a royalty fee of thirty-five percent (35%) of net sales of all Distributor's food

3

photography CD-ROMS containing Developer's digital photos on a quarterly basis.  Unless otherwise mutually agreed to in writing, Distributor shall make said royalty payments and provide Developer with a royalty report within thirty (30) days following the end of each quarter.  A late payment charge of one and one-half percent (1.5%) per month shall be charged upon unpaid balances due after said thirty (30) day period.  The parties agree and understand that Distributor will purchase from Developer on an individual basis, four (4) digital photos each month, at a mutually agreed price, for placement in Distributor's Ad-Builder product for purposes of promoting Developer's products.  Developer agrees that it shall not be entitled to any royalty from Distributor's Ad-Builder product containing said promotional photos.

### 2.3 Definition of Net Sales

"Net Sales" for the purposes of this Agreement means the price received by Distributor for each CD-ROM sold by Distributor to a third party, which CD-ROM contains Developer's digital photos, exclusive of all taxes (other than those levied on Distributor's net income), insurance, shipping and other incidental charges (such as restocking fees), and less sales commissions paid to third parties, credits, discounts, rebates and any refunds for returns. Distributor may set the price for its CD-ROMS containing Developer's digital photos, including discounts, in its sole discretion.  Distributor may also distribute, free of charge, a commercially reasonable number of demonstration CD-ROMS containing Developer's digital photos as promotional and marketing incentives and no royalty shall be due Developer thereon.

## 2.4 Competitive Pricing

Developer agrees that it will not sell its digital photos to a third party competitor of Distributor upon terms which will result in an effective royalty to a third party competitor of Distributor of less than the 35% of net sale royalty being charged Distributor hereunder.

## 3. Ownership and Property Rights

### 3.1 Ownership

Developer represents and warrants that it has all necessary rights in and to all copyrights, patents and other proprietary rights associated with the digital photos that are necessary to market, distribute and license same. Developer has the unrestricted right and authority to enter into this Agreement and to grant the rights and licenses hereunder with respect to the digital photos.

### 3.2 Property Rights

Distributor acknowledges and agrees that the digital photos and all other items licensed hereunder and all copies thereof constitute valuable trade secrets or proprietary and confidential information of Developer; that title thereto is and shall remain in Developer; and that all applicable copyrights, trade secrets, patents and other intellectual and property rights in the digital photos and all other items licensed hereunder are and shall remain in Developer. All other aspects of the digital photos and all other items licensed hereunder, including without limitation, programs, methods of processing, the specific design and structure of individual programs and their interaction and the unique programming techniques employed therein, as well as screen formats are and shall remain the sole and exclusive property of Developer

5

and shall not be sold, revealed, disclosed or otherwise communicated, directly or indirectly, by Distributor to any person, company or institution whatsoever, other than for the purposes set forth herein.

It is expressly understood and agreed that no title to, or ownership of, the digital photos or any part thereof, is hereby transferred to Distributor. Appropriate copyright notices shall appear on all diskettes and other tangible media distributed by Distributor. All use of any Developer trademark in any marketing and promotion, including but not limited to, advertisements and packaging, shall contain notification that such trademark is a trademark which was developed and is owned by Developer.

### 3.3 Unauthorized Copying

Distributor agrees that it will not copy, modify or reproduce the digital photos in any way, except as otherwise provided herein. However, Distributor is not responsible for the disclosure, use, modification or copying of the digital photos by its customers or any other third party so long as Distributor had no prior knowledge that its customers or any other third party intended to disclose, use, modify, or copy the digital photos. Distributor agrees to notify Developer promptly of any circumstances Distributor has knowledge of relating to any unauthorized use or copying of the digital photos by any person or entity not authorized to do so.

### 4. Warranty

### 4.1 Customer Warranty

Developer warrants that the digital photos will be professionally produced in accordance with generally accepted industry standards of quality and that the contents of each one off CD-ROM shall be produced after reasonable consultation with

Distributor with regard its market needs. Distributor acknowledges and agrees that this warranty furnished by Developer is the only warranty made (or to be made) with respect thereto.

## 4.2 Disclaimer of Additional Warranties

OTHER THAN THOSE WARRANTIES SET FORTH IN PARAGRAPH 3.1 AND 4.1, DEVELOPER SPECIFICALLY DISCLAIMS ALL WARRANTIES EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO DEFECTS IN THE DIGITAL PHOTOS OR OTHER PHYSICAL MEDIA AND DOCUMENTATION, OPERATION OF THE DIGITAL PHOTOS, AND ANY PARTICULAR APPLICATION OR USE OF THE DIGITAL PHOTOS.  IN NO EVENT SHALL DEVELOPER BE LIABLE FOR ANY LOSS OF PROFIT OR ANY OTHER COMMERCIAL DAMAGE, INCLUDING BUT NOT LIMITED TO SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES.

## 5. Termination

## 5.1 Events Causing Termination

This Agreement may be terminated by Developer or Distributor under any of the following conditions:

(a) if the other party shall be declared insolvent or bankrupt;

(b) if a petition is filed in any court and not dismissed in ninety (90) days to declare the other party bankrupt or for a reorganization under the Bankruptcy Law or any similar statute;

(c) if a Trustee in Bankruptcy or a Receiver or similar entity is appointed for the other party; or

7

(d)   If either party repudiates or fails to timely perform any obligation under this Agreement, the nondefaulting party shall serve written notice of default upon the other party and if such default is not cured within seven (7) calendar days after service of such notice, then:

(i) if Developer is in default, Distributor may, upon service of notice to Developer within thirty (30) calendar days after service of the default notice, either terminate this Agreement or seek specific performance or other available legal remedies;

(ii) if Distributor is in default, Developer may, upon service of notice to Developer within thirty (30) calendar days after service of the default notice, either terminate this Agreement or seek specific performance or other available legal remedies.

**5.2 Duties Upon Termination**

Upon termination of this Agreement for any reason, other than non-payment by Distributor for which Distributor has no valid right of set off, the parties agree to continue their cooperation in order to effect an orderly termination of their relationship. Developer, notwithstanding the termination of this Agreement, shall continue to provide the one off CD-ROMS containing its digital photos to Distributor for a period of four (4) months following the termination of this Agreement.   This is intended to permit Distributor to press and distribute at least two (2) additional CD-ROMS for its existing customer base to allow Distributor to protect its existing customer base and provide them with an orderly transition to a different source of digital photos.  Distributor shall pay Developer pursuant to the royalty provisions of this Agreement for the sale of any post-termination digital photos sold

8

by Distributor pursuant to this paragraph. In the event that this Agreement is terminated for any reason, and as a result of said termination, Distributor must refund any amounts to any customer of any service containing Developer's digital photos, Developer shall reimburse Distributor for any royalty which Developer has received which is attributable to said refunds within thirty (30) days of written demand by Distributor, which written demand shall set forth the basis for the refund.

## 6. Indemnification

### 6.1 Copyrights, Patents and Intellectual Property

Developer shall indemnify, defend and hold Distributor harmless from any claims, demands, liabilities, losses, damages, judgments or settlements, including all reasonable costs and expenses related thereto, including attorney's fees, directly or indirectly resulting from any claimed infringement or violation of any copyright, patent or other intellectual property right with respect to the digital photos so long as the digital photos are used in accordance with the documentation and specifications provided by Developer, and Distributor has adhered to its obligations under this Agreement. Following notice of a claim or a threat of actual suit, Developer shall:

(a) procure for Distributor the right to continue to use, distribute and sell the digital photos at no additional expense to Distributor; or

(b) provide Distributor with a non-infringing version of the digital photos.

## 6.2 Cooperation by Distributor

Notwithstanding paragraph 6.1 of this Agreement, Developer is under no obligation to indemnify and hold Distributor harmless unless:

(a) Distributor shall have promptly notified Developer of the suit or claim and furnished Developer with a copy of each communication, notice or other action relating to said claim;

(b) Developer shall have the right to assume sole authority to conduct the trial or settlement of such claim or any negotiations related thereto at Developer's expense provided Distributor shall be informed of the status of negotiations and informed of the particulars of any formal settlement offer prior to submission of any offer to a third party; and

(c) Distributor shall provide such reasonable information and assistance as is requested by Developer in connection with such claim or suit.

## 6.3 Indemnification by Distributor

Distributor shall indemnify, defend and hold Developer harmless from any claims, demands, liabilities, losses, damages, judgments or settlements, including all reasonable costs and expenses related thereto, including attorney's fees, directly or indirectly resulting from any claimed infringement or violation of any copyright, patent or other intellectual property right resulting from any negligence or act of the Distributor with respect to the digital photos, except for those photos submitted by the Developer in accordance with Section 2.1 above, and further excepting any matter arising as a result of a violation of Developers representations and warranties set forth in Section 3.1 above.

10

## 6.4 Cooperation by Developer

Notwithstanding paragraph 6.3 of this Agreement, Distributor is under no obligation to indemnify and hold Developer harmless unless:

(a) Developer shall have promptly notified Distributor of the suit or claim and furnished Distributor with a copy of each communication, notice or other action relating to said claim;

(b) Distributor shall have the right to assume sole authority to conduct the trial or settlement of such claim or any negotiations related thereto at Distributor's expense provided Developer shall be informed of the status of negotiations and informed of the particulars of any formal settlement offer prior to submission of any offer to a third party; and

(c) Developer shall provide such reasonable information and assistance as is requested by Distributor in connection with such claim or suit.

## 7. Product Promotion and Support

### 7.1 Distributor's Obligation

During the term hereof, Distributor, as part of its activities to promote the distribution of the digital photos, agrees to confer periodically with Developer, at Developer's request, on matters relating to market conditions, sales forecasting, product planning and update, promotional and marketing strategies and programming. However, Distributor shall have sole control and discretion with regard the marketing and sale of Developer's digital photos and the media said digital photos are incorporated in for resale.

11

## 8. General

## 8.1 Confidential Information

Developer and Distributor acknowledge that, in the course of dealings between the parties, each party will acquire information about the other party, its business activities and operations, its technical information and trade secrets, and its customer base of a highly confidential and proprietary nature.  Each party shall hold such information in strict confidence and shall not reveal the same, except for any information which is generally available to or known to the public; known to such party prior to the negotiations leading to this Agreement; independently developed by such party outside the scope of this Agreement; or lawfully disclosed by or to a third party or tribunal.  The confidential information of each party shall be safeguarded, including but not limited to customer lists, by the other to the same extent that it safeguards its own confidential materials or data relating to its own business.

## 8.2 Force Majeure

Neither party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or interruption of service resulting, directly or indirectly, from acts of God, civil or military authority, acts of the public enemy, war, riots, civil disturbances, insurrections, accidents, fire, explosions, earthquakes, floods, the elements, strikes, labor disputes, shortages of suitable parts, materials, labor or transportation or any causes beyond the reasonable control of such party.

## 8.3 Jurisdiction and Venue

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and

12

the State of Illinois.  Non-exclusive jurisdiction for litigation of any dispute, controversy or claim arising out of, in connection with, or in relation to this Agreement, or the breach thereof, may be in the United States Federal District Courts in Peoria, Illinois, or Boston, Massachusetts, or in the Illinois or Massachusetts State Courts having competent jurisdiction, and located within Peoria, Illinois or Boston, Massachusetts.

### 8.4 Entire Agreement

This Agreement, including any Schedules attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all previous proposals, negotiations, representations, commitments, writings and all other communications between the parties, both oral and written.

This Agreement may not be released, discharged, changed or modified except by an instrument in writing signed by a duly authorized representative of each of the parties.

The terms of this Agreement shall prevail in the event that there shall be any variance with the terms and conditions of any invoice or other such document submitted by Developer or any purchase order or any other such document submitted by Distributor.

This Agreement shall not be valid until signed and accepted by both parties and no change, termination or attempted waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom the same is sought to be enforced.

### 8.5 Independent Contractors

It is expressly agreed that Developer and Distributor are acting hereunder as independent contractors and under no circumstances shall any of the employees of one party be deemed the

13

employees of the other for any purpose.  This Agreement shall not be construed as authority for either party to act for the other party in any agency or other capacity or to make commitments of any kind for the account of, or on behalf of, the other party, except to the extent, and for the purposes, expressly provided for and set forth herein.

### 8.6 Attorneys' Fees

In any action between the parties to enforce any of the terms of this Agreement, the prevailing party shall be entitled to recover expenses, including reasonable attorneys' fees.

### 8.7 Notice

Any notice required to be given by either party to the other shall be deemed given if in writing and actually delivered or deposited in the United States mail in registered or certified form, return receipt requested, postage prepaid, addressed to the party to whom notice is being given at the address of such party set forth above or to such other address to which the sending party has been directed to send notices by the addressee.

### 8.8 Assignment

This Agreement is not assignable by either party hereto without the consent of the other, except: (a) in the case of a merger, sale of all or substantially all of the assets, or other corporate or business reorganization of the assigning party; or (b) the sale of all rights to license and sublicense the digital photos to the purchaser of said rights.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors.

14

### 8.9 Severability

If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other part or provision of this Agreement.

### 8.10 Waiver

No waiver by any party of any breach of any provision hereof shall constitute a waiver of any other breach of that or any other provision hereof.

### 8.11 Section Headings

Section Headings are inserted for convenience only and will not be considered to define, limit or effect the interpretation or construction of the Agreement.

### 8.12 Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by a duly authorized representative as of the date set forth above.

ADLIFE MARKETING AND                     MULTI-AD SERVICES, INC.
COMMUNICATIONS CO., INC.

BY: _____              BY: _____

Title: ____President_____               Title: __VP Media Services__

tnp\adlife.ma

15

# Schedule 1

| Volume | Transparencies Due to MASI | Product Ship Date |
|---|---|---|
| May/June | January 24, 1994 | March 22, 1994 |
| July/August | March 24, 1994 | May 23, 1994 |
| September/October | May 24, 1994 | July 22, 1994 |
| November/December | July 25, 1994 | September 22, 1994 |
| January/February '95 | September 23, 1994 | November 22, 1994 |

Per agreement, AdLife will provide 50 individual color transparencies by the above-listed due dates. Multi-Ad Services will provide the scanning services necessary to digitize the photos, create clipping paths, and create a CD-ROM disk from these transparencies.

Agreed this 8th day of June, 1994.

AdLife Marketing & Comm., Inc:

_John P. Puccio_
Signature

_John P. Puccio_
Printed Name

_President_
Title

_June 8, 1994_
Date

Multi-Ad Services, Inc.:

_George R. Messer_
Signature

_George R. Messer_
Printed Name

_V.P. Media Services_
Title

_June 8, 1994_
Date Enacted

# Exhibit "C"

## CONTENT LICENSE AGREEMENT

THIS AGREEMENT ("**Agreement**"), effective as April 1, 2011 (the "**Effective Date**"), is entered into by and between Multi-Ad Services, Inc., with offices at 1720 W. Detweiller Drive, Peoria, IL 61615 ("**MultiAd**") and Gannett Supply Corporation, Inc., with offices at 7950 Jones Branch Drive, McLean, VA 22108 ("**Gannett**").

In consideration of the mutual covenants and promises recited below, the parties, intending to be legally bound, agree as follows:

### TERMS AND CONDITIONS

1.  **Definitions**.

    1.1   "**Affiliates**" means any publication, television station or other entity owned and/or operated by Gannett or by Gannett's parent or subsidiaries, joint operating agencies under the Newspaper Preservation Act, joint ventures or affiliates, along with any website(s) and newsletter(s) associated with such publication, television station or other entity.

    1.2   "**Licensed Materials**" means the materials specified on Schedule A.

    1.3   "**MultiAd Services**" means the MultiAd-operated websites and databases containing the materials used to create and design advertisements, including without limitation, the AdBuilder website, currently located at http://www.adbuilder.com, and the Creative Outlet website, currently located at http://www.creativeoutlet.com

2.  **Grant of License**.  MultiAd hereby grants to Gannett and its Affiliates a non-exclusive, non-transferable, worldwide license, subject to the terms of this Agreement, to access the MultiAd Services, and use the Licensed Materials and any portion thereof during the Term, including the right to reproduce, display, create derivative works from, and distribute the Licensed Materials in connection with producing and distributing advertisements in any media now known or hereafter developed, including without limitation newspapers, special editions, magazine editions, e-editions, sports publications, television broadcasts, websites and other derivative products and/or services that display content on devices, such as computers, email clients, tablet computers, E-book readers, instant messaging clients, pagers, personal digital assistants, mobile web devices, landline phones, Really Simple Syndication (RSS) feeds, Internet appliances, interactive and non-interactive television display screens and/or interactive and non-interactive video display screens (collectively the "**Products and Services**") in accordance with the terms of this Agreement.  Notwithstanding anything to the contrary in this Agreement, Gannett and its Affiliates shall have the right to use and publish any of the Licensed Material an unlimited number of times in multiple products and services, across all Products and Services, throughout the Term of this Agreement.

3.  **Access to the MultiAd Services**.  During the Term, MultiAd shall make the Licensed Materials available to Gannett for download through the MultiAd Services.  MultiAd will provide Gannett with the logons and passwords necessary to access and download the Licensed Materials from the MultiAd Services.

4.  **Ownership**.  Nothing in this Agreement shall effect a transfer of copyright from MultiAd to Gannett.  As between Gannett and MultiAd, MultiAd shall retain all ownership rights, including copyrights, in the Licensed Materials it makes available to Gannett.

**5.**  **Fees**. In consideration for use of the Licensed Materials, Gannett shall pay to MultiAd a monthly fee of $17,000 (seventeen thousand dollars) (the "**Monthly Fee**").

**6.**  **Payment**. MultiAd shall provide Gannett with an invoice for the Monthly Fee for such month. Gannett agrees to remit payment of all undisputed invoices within thirty (30) days after receipt of the applicable invoice.

**7.**  **Term; Termination**.

  **7.1**  **Term and Renewals**. This Agreement shall have an initial term of two (2) years commencing on the Effective Date ("**Initial Term**") unless terminated earlier in accordance with this Section 7. Gannett may renew the Agreement for additional one year terms at its own discretion by providing MultiAd with notice at least thirty (30) days prior to the end of the then-current term (each such additional term is a "**Renewal Term**"). The Initial Term and Renewal Term are collectively referred to herein as the "**Term**."

  **7.2**  **Termination for Breach**. Either party will have the right to terminate this Agreement immediately upon written notice at any time during the Term if the other party materially breaches this Agreement and fails to cure such breach within thirty (30) days after its receipt of written notice describing such breach.

  **7.3**  **Effects of Termination**. After the expiration or termination of this Agreement, Gannett and its Affiliates may continue to reproduce, display, create derivative works from, and distribute any Licensed Material, which was incorporated into an advertisement created by Gannett or its Affiliates during the Term, in connection with producing and distributing advertisements in any Products and Services.

**8.**  **Representations and Warranties**.

  **8.1**  **By MultiAd**. MultiAd represents and warrants that: (i) it has full power and authority to enter into this Agreement and to carry out its obligations under this Agreement; (ii) the Licensed Materials will be free from defects in material and workmanship; (iii) it has obtained all clearances, license and/or permissions necessary for Gannett and its Affiliates to use the Licensed Materials; and (iv) no part of the Licensed Materials, or Gannett or its Affiliates' use of the Licensed Materials in accordance with this Agreement, will be libelous, constitute false or deceptive advertising, or violate or infringe any common law or statutory right of any person or other entity, including without limitation, any contractual rights, proprietary rights, trademark, service mark, copyright or patent rights, or any rights of privacy or publicity, nor will they violate any applicable law or regulation.

  **8.2**  **By Gannett**. Gannett represents and warrants that it has full power and authority to enter into this Agreement and to carry out its obligations under this Agreement.

  **8.3**  **DISCLAIMER**. EXCEPT FOR THE WARRANTIES MADE IN SECTIONS 8.1 AND 8.2, THE PARTIES HEREBY DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, CONCERNING THE SUBJECT MATTER OF THIS AGREEMENT.

**9.**  **Indemnification**.

**9.1**    By MultiAd.  MultiAd will indemnify, defend and hold harmless Gannett, its Affiliates, and the directors, officers, employees and agents of each of these from and against any actions, claims, demands, liabilities, expenses and costs (including, but not limited to reasonable attorney's fees) arising out of any third party claim relating to any breach or alleged breach by MultiAd of any of its representations, warranties, covenants or obligations under this Agreement.

**9.2**    By Gannett.  Gannett will indemnify, defend and hold harmless MultiAd and its directors, officers, employees and agents from and against any actions, claims, demands, liabilities, expenses and costs (including, but not limited to reasonable attorney's fees) arising out of any third party claim relating to any breach or alleged breach by Gannett of any of its representations, warranties, covenants or obligations under this Agreement.

**9.3**    Notice and Participation.  Except as otherwise stated herein, all indemnitees seeking indemnification pursuant to this section will give prompt notice to indemnifying party; provided, however, that failure to give prompt notice will not relieve the indemnifying party of any liability hereunder (except to the extent the indemnifying party has suffered actual material prejudice by such failure).  The indemnifying party shall have the right to assume the defense of any such claims or litigation, provided that the indemnifying party shall not enter into any settlement without the indemnified party's prior written consent.  If, in the reasonable discretion of the indemnified party, the indemnifying party fails to diligently pursue and defend a claim or litigation, then the indemnified party may assume the control of such claim or litigation at the indemnifying party's expense.  The settlement of any claim or litigation, in whole or in part, by an indemnified party without the indemnifying party's prior written consent (which consent shall not be unreasonably withheld, delayed, or conditioned) shall release the indemnifying party from its obligations hereunder with respect to that portion of the claim or litigation so settled.  The indemnified party shall cooperate fully with the indemnifying party in the defense, settlement or other disposition of such claim or litigation, and shall have the right, but not the obligation, to join in and be represented by its own counsel, at its own expense.

**10.    Limitation of Liability.**    EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS AS SET FORTH IN SECTION 9 ABOVE, NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR ANY ENTITY FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER IN AN ACTION OR ARISING OUT OF BREACH OF CONTRACT, TORT OR ANY OTHER CAUSE OF ACTION EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**11.    Confidentiality.**

**11.1**    Definition.  As used in this Agreement, **"Confidential Information"** means any non-public information disclosed by one party to the other party in connection with this Agreement that is disclosed in writing, orally or by inspection and is identified in writing or orally during disclosure as "Confidential" or "Proprietary" or which the receiving party has reason to believe is treated as confidential by the other party. "Confidential Information" shall not include information that the receiving party can demonstrate (A) is, as of the time of its disclosure, or thereafter becomes part of the public domain through a source other than the receiving party; (B) was known to the receiving party as of the time of its disclosure; and (C) is independently developed by the receiving party without use of the Confidential Information of the other party, or (D) is subsequently learned from a third party that, to the receiving party's knowledge, is not under a confidentiality obligation to the providing party.

**11.2**    Restrictions.  MultiAd and Gannett agree that they will not, during the Term and for one year thereafter, disclose, nor permit any of their employees or agents to disclose, to any other person or entity any Confidential Information received from the other, except as may be required pursuant to the

3

order or requirement of a court, administrative agency, or other governmental body; provided, however, that the receiving party shall provide prompt notice thereof to the other party to afford the other party adequate time to seek a protective order. Each party will be deemed to have met its obligations hereunder if it treats the other party's Confidential Information with the same degree of confidentiality it affords its own sensitive business information. Upon termination or expiration of this Agreement, or at the request of the disclosing party, the receiving party shall (at its option) return the Confidential Information to the disclosing party, or destroy it and, upon the disclosing party's request, certify that it has taken such action.

12.   Miscellaneous.

    12.1   Notices. Any notice provided pursuant to this Agreement will be in writing and will be deemed given (i) if by hand delivery, upon receipt thereof; (ii) if mailed, five (5) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested; or (iii) if sent via overnight courier, upon receipt. All notices pertaining to this Agreement will be addressed to the parties at the respective addresses below:

GANNET SUPPLY CORPORATION, INC.    **With a copy to:**
7950 Jones Branch Dr.    GANNETT CO., INC.
McLean, VA 22107    7950 Jones Branch Dr.
Attn: Karen Russell Moreno, President.    McLean, VA 22107
    Attn: Law Department

**MULTI-AD SERVICES, INC.**    **With a copy to:**
**1720 W. Detweiler Drive**    **MULTI-AD SERVICES, INC**
**Peoria, IL 61615**    **1720 W. Detweiler Drive**
Attn: Nicole Schmidt, Call Center Manager    **Peoria, IL 61615**
    **Attn: John Kocher, Executive Vice President**

Either party may change its address or its designated addressee by giving written notice to the other party in accordance with the terms of this section.

    12.2   Independent Contractor. Nothing in this Agreement shall be construed to constitute or appoint either party as the agent or representative of the other party for any purpose whatsoever, or to grant to either party any right or authority to assume or create any obligation or responsibility, express or implied, for or on behalf of or in the name of the other, or to bind the other in any way or manner whatsoever.

    12.3   Assignment. Neither this Agreement nor any interest herein or in the license may be assigned by either party without the prior written approval of the other party, which approval will not be unreasonably withheld, except that either party may assign this Agreement in its entirety to any purchaser of all or substantially all of its business or assets pertaining to the line of business to which this Agreement relates or to any subsidiary or other affiliate of the party without the other party's approval.

    12.4   Force Majeure. Neither party shall be liable to the other for any loss or damage attributable to, and neither party shall deemed to be in default hereunder as a result of, any failure or delay in performance caused by force majeure. For purposes of this Agreement, the term "force majeure" shall include strike, lockout, earthquake, hurricane, flood, fire, or other acts of God or nature, war, rebellion, civil disorders, laws, regulations, acts of civil or military authorities (including the denial or cancellation of any export or other necessary license), and any other similar causes beyond the reasonable control of the party whose performance is affected. Where a force majeure event remains in effect for more than three months, or if at the beginning of a force majeure event it is clear that it will last longer than three

4

months, either party shall have the right to terminate this Agreement immediately upon providing notice of its intent to terminate.

    **12.5**   Non-Exclusivity. Nothing in this Agreement limits the ability of either party (i) to enter into other agreements with third parties with respect to arrangements similar in nature to or the same as those covered under this Agreement, or (ii) to provide goods or services that compete with the goods or services of the other party.

    **12.6**   No Publicity. Unless required by law, no party will, without the prior written approval of the other party, make any press release, or other similar announcement relating to the existence or terms of this Agreement.

    **12.7**   Governing Law. This Agreement shall be interpreted and construed according to, and governed by, the laws of the State of New York, as applicable to agreements made and wholly performed therein and without reference to its conflicts of law rules.

    **12.8**   Jury Trial. THE PARTIES SPECIFICALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS, OR STATUTORY CLAIM, COUNTERCLAIM, OR CROSS-CLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT, BECAUSE THE PARTIES HERETO, BOTH OF WHOM ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE.

    **12.9**   Entire Agreement; Waiver; Amendment. This Agreement constitutes the complete and exclusive statement of all mutual understandings between the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous proposals, communications and understandings, oral or written relating to the subject matter of this Agreement. No waiver of any provision hereof or of any right or remedy hereunder shall be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. No delay in exercising, no course of dealing with respect to, and no partial exercise of any right or remedy hereunder shall constitute a waiver of any other right or remedy, or future exercise thereof. This Agreement may not be modified or altered except by written instrument duly executed by authorized representatives of both parties.

    **12.10**   Severability. If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, such provision will be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intentions of the parties, and the remainder of the Agreement will remain in full force and effect.

    **12.11**   Survival. The terms of Sections 2, 5 (with regard to payments that accrued prior to the end of the Term), 7, 8, 9, 10, 11, and 12 shall survive termination, cancellation or expiration of this Agreement, and shall remain in full force and effect.

    **12.12**   Counterparts. This Agreement and any amendments may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one agreement.

    **12.13**   Contract Interpretation. Ambiguities, inconsistencies, or conflicts in this Agreement will not be strictly construed against either party but will be resolved by applying the most reasonable interpretation under the circumstances, giving full consideration to the parties' intentions at the time this Agreement is entered into and common practice in the industry.

IN WITNESS WHEREOF, the parties have set their hands as of the Effective Date.

Gannett Supply Corporation, Inc.                    Multi-Ad Services, Inc.

BY: _Cynthia Sewpaul_                               BY: _Nicole Schmidt_

NAME: _Cynthia Sewpaul_                             NAME: _Nicole Schmidt_

TITLE: _Specialist, Procurement Services_           TITLE: _Call Center Manager_

DATE: _March 25, 2011_                              DATE: _3/24/11_

## SCHEDULE A

### LICENSED MATERIALS

The "**Licensed Materials**" shall consist of all content offered by MultiAd through the MultiAd Services, including, but not limited to, retail art and spec ads, and classified art and spec ads. The Licensed Materials also includes without limitation, the following MultiAd art collections:

- AdBuilder – a diverse collection of photos, illustrations, headers, borders, ad templates and tab covers covering numerous subjects;

- Food Stock by AdLife – grocery and restaurant quality, non-branded color food photographs and grocery ad templates;

- Auto Stock by AdLife – library of automotive location shots featuring new and used cars;

- Auto Images – studio photographs of the latest automotive makes and models with transparent photographs;

- Stock Photography – encompassing, professional collection of stock photography with and without surrounding backgrounds;

- Logos & Trademarks – vectored corporate symbols and logos for over 9,000 companies as well as military, college and state symbols;

- Web – customizable flash web banner templates and animated .GIF files and flash elements that can be used to create online content;

- Holiday – annual collection of holiday-themed spec ads and artwork;

- Special Sections – editorial content with corresponding artwork on topics such as dining, bridal, health, car care, careers and travel;

- Fun & Games – kids' content, horoscopes, crosswords puzzles, word searches and more;

- Kids Corner – content for kids.

# Exhibit "D"

Jill Addy Wright
LSA Creative Outlet
VP, LSA Co-op and Creative
1720 W. Detweiller Drive
Peoria, IL 61615

December 12, 2016



Dear █████████

I'm writing to inform you of an important change to your Creative Outlet services account. Adlife Marketing & Communications, the supplier of one of our food photography realms, has terminated their provider contract with LSA (formerly MultiAd/AdBuilder) effective March 1, 2017. This means that, as of March 1, 2017, you will no longer have access to or the right to use Food Photography by Adlife through our website and our Creative Outlet subscription.

We apologize for any inconvenience this may cause, but rest assured, Creative Outlet is still able to fulfill your food photography needs. We have arranged to provide you access to our high quality Food Images collection. In order to facilitate your transition to this new collection, we will provide you access to the Food Images collection at no additional charge beginning January 1, 2017. Beginning March 1, 2017, this new collection will be available to you under your current subscription at the same price you were paying for the AdLife Food Photography.

Because you will have no further rights to use AdLife Food Photography in any media (online and print) effective March 1, 2017, we strongly suggest that you take appropriate steps to ensure that you will not inadvertently use these images after that date. Doing so may subject you to copyright infringement claims by AdLife Marketing.

We look forward to continuing to provide you high quality images to meet your marketing needs. We have a dedicated team of support representatives to assist you in this transition. If you have any questions or concerns, feel free to contact a member of our team.

Sincerely,


Jill Addy Wright
VP, LSA Co-op and Creative

# Exhibit "E"



# Exhibit "F"



ATTORNEYS AT LAW

151 North Franklin Street
Suite 2500
Chicago, IL  60606

312-704-3000
312-704-3001 (fax)
www.hinshawlaw.com

Mark K. Suri
312-704-3518
msuri@hinshawlaw.com

October 31, 2018

**<u>Via Email</u>**
nsarega@higbeeassociates.com

Naomi Sarega
Law Firm of Higbee & Associates
1504 Brookhollow Drive, Suite 112
Santa Ana, CA 92705

      Re:  *Adlife Marketing & Communications Company v Multi-Ad Solutions, LLC*

Dear Ms. Sarega:

      This responds to your September 12, 2018 letter.  While we continue to hold out hope the parties may be able to resolve this matter, Adlife's continued unrealistic view of its potential success and damages may thwart that.  I understand your reluctance to "rehash" the substance of the case, as any analysis of the substance of this case shows that your client has no chance of success.

      That being said, our client would prefer to resolve this matter sooner rather than later, with finality and clarity.  To that end, our client is prepared to offer ██████████████ ██████████████  to promptly and finally resolve this lawsuit.  This would include Plaintiff dismissing with prejudice the lawsuit against all parties and a release and covenant not to sue any currently named Defendants and any other potential defendants on any claim under the Adlife / Multi-Ad Agreement.  This offer is inclusive of Adlife's claims for attorneys' fees, costs and expenses.  It would not, however, affect any of your client's ongoing or future claims against other parties for copyright infringement.

                    Very truly yours,

                    HINSHAW & CULBERTSON LLP

                    Mark K. Suri

MKS:db
cc:    Ambrose McCall
       Mathew Higbee
       John Tehranian
       Oscar Orozco-Botello

# Exhibit "G"

Higbee & Associates                                    A NATIONAL LAW FIRM

                                              January 29, 2021

**VIA E-MAIL:**
Beth McMillan
beth.mcmillan@mgclaw.com

RE:   **Copyright Infringement By Quality Foods**

Ms. McMillian,

     This letter is a follow up to my unsuccessful attempts to reach you by telephone and email on January 20, 20201 and by telephone on January 25, 2021.

     I represent Adlife Marketing & Communications Co. Inc. ("Adlife"), which, as you know, is the copyright holder to an extensive library of food photographs ("Food Photographs").  As you may recall, Adlife filed a claim for copyright infringement against your client, Quality Foods of Anderson, S.C., Inc. ("Quality Foods"), which was resolved via a written settlement agreement executed on July 23, 2019 ("Settlement Agreement"). For your reference, I have attached a copy of the signed Settlement Agreement to this letter as Exhibit A.

     Pursuant to Paragraph 2 of the Settlement Agreement, Adlife's release of claims against Quality Foods only extends to use of Adlife's Food Photographs "that have been published in any Quality [Foods] advertisements prior to or as of the Effective Date" of July 23, 2019. Any further use of Adlife's Food Photographs by Quality Foods after the effective date is not authorized.

     It has come to Adlife's attention that Quality Foods has continued to use Adlife's Food Photographs in its weekly advertisements after the effective date of the Settlement Agreement. Specifically, Adlife has discovered four of its Food Photographs in Quality Foods advertisements distributed between October of 2020 and January of 2021. For your reference, I have attached copies of the infringing advertisments to this letter as Exhibit B.

     Quality Foods' continued use of Adlife's Food Photographs is not authorized, and Adlife demands that Quality Foods immediately cease and desist from any further unauthorized use of its intellectual property.

     Please contact me no later than February 12, 2021 so that we can discuss a resolution of this matter. I can be reached by email at rcarreon@higbeeassocuates.com or on my cell phone at 626-533-7357. If I do not hear from you by that date, I will advise my client to move forward accordingly.

     Please be advised that Quality Foods is under a legal duty to maintain, preserve, retain, protect, and not destroy any and all documents and data, both electronic and hard copy, that may be relevant to the claims set forth in this letter. The failure to preserve and retain the electronic data and evidence outlined in this

**Corporate HQ** 1504 Brookhollow Dr., Suite 112 Santa Ana, CA 92705
**Phone** (714) 617-8385  **Fax** (714) 617-8511  **Web** higbeeassociates.com

1

Higbee & Associates                                    A NATIONAL LAW FIRM

notice may constitute spoliation of evidence, which could subject Quality Foods to legal claims for damages and/or evidentiary and monetary sanctions.

This letter is not intended, nor should it be construed, as a full recitation of all of the facts in this matter. Additionally, this letter is written without waiver or relinquishment of any rights or remedies, all of which are hereby expressly reserved.

Thank you for your attention to this matter.

Sincerely,

Ryan E. Carreon, Esq.

Corporate HQ 1504 Brookhollow Dr., Suite 112 Santa Ana, CA 92705
Phone (714) 617-8385  Fax (714) 617-8511  Web higbeeassociates.com

2

# Exhibit "A"

## CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT

This **CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT** ("Agreement") is entered into by and between Adlife Marketing and Communications Company, Inc. ("Adlife") and Quality Foods of Anderson, S.C., Inc. ("Quality"), Gannett Company, Inc. ("Gannett"), and Mainstreet Newspapers, Inc. ("Mainstreet") (together "Defendants") and is effective the date the last one of the parties has executed the Agreement and provided it to the other parties (the "Effective Date"). The parties agree as follows:

**1. Recitals.** The parties to this Agreement acknowledge and agree that this Agreement is made with reference to the following facts, which are not only recitals but are also an integral part of this Agreement.

> 1.1. Adlife has asserted copyright infringement claims against Quality alleging the unauthorized use of certain photographs in the litigation captioned *Adlife Marketing & Communications Company, Inc. vs Quality Foods of Anderson, S.C., Inc.*, C.A. No.: 8:18-cv-01976-TMC in the U.S. District Court for the District of South Carolina (the "Claim"), and Quality has alleged third-party claims against Gannett and Mainstreet arising from the Claim against Quality.

> 1.2. Adlife represents that it is the exclusive owner and holder of the copyrights in the photographs at issue in the litigation set forth in the copy of the Complaint attached hereto as Exhibit A (the "Photographs");

> 1.3. Defendants have denied the Claim and have denied any liability to Adlife or to each other, and

> 1.4. Without admission of liability, the parties desire to settle all claims between them related to the Photographs and any other photographs published in Quality advertisements prior to or as of the Effective Date of this Agreement, and enter into this Agreement and release providing for a full, final and complete settlement on the terms and conditions set forth herein.

**2. Settlement and Release.** Except for the agreements, obligations and covenants arising under this Agreement, Adlife releases, remises and discharges Defendants and their respective officers, directors, members, employees, owners, attorneys, insurers, agents, affiliated entities, companies, parents, subsidiaries, successors, and assigns from any and all claims, demands, damages, losses, costs, expenses, fees, actions, causes of action, suits, liabilities, agreements, promises, and debts, whether known or unknown, actual or potential, from the beginning of time until the Effective Date, arising out of or related in any way to the publication of any of the Photographs in Quality advertisements, other use of any of the Photographs by the Anderson Independent Mail or Main Street News (but not including any such use by other publications of Gannett or Mainstreet), the Claim, or any other photographs in which Adlife may assert any interest that have been published in any Quality advertisements prior to or as of the Effective Date of this Agreement. Defendants

release, remise, and discharge each other and their respective officers, directors, members, employees, owners, attorneys, insurers, agents, affiliated entities, companies, parents, subsidiaries, successors, and assigns from any and all claims, demands, damages, losses, costs, expenses, fees, actions, causes of action, suits, liabilities, agreements, promises, and debts, whether known or unknown, actual or potential, arising out of or related in any way to the Photographs on Quality advertisements, the Claim, or any other photographs in which Adlife may assert any interest that have been published in any Quality advertisements prior to or as of the Effective Date of this Agreement.

**3. Covenant Not to Sue.** In further consideration of the promises, warranties and agreements set forth herein, Adlife hereby further covenants and agrees not to bring, commence, prosecute, maintain, continue to maintain or cause or permit to be brought, commenced, prosecuted, maintained or continued to be maintained, any suit, action or administrative proceeding, either at law or in equity, in any court or administrative body of the United States or in any state thereof or elsewhere against the releasees with respect to the released claims.

**4. Adlife's Representations and Warranties.** Adlife represents and warrants that it is the owner of all copyright and all moral rights in the Photographs in the United States of America and all other countries throughout the world and that Adlife has not granted and will not grant to any third party any rights or license in the Photographs, or any copyright or moral rights that would permit the third party to raise a claim against Defendants in respect of Defendants' use of the Photographs. Adlife further represents and warrants that it is not aware of any other claims that it may have against any of the Defendants other than those that are released herein.

**5. Mutual Representations and Warranties.** Adlife and Defendants represent and warrant that they have read and understand the provisions of this Agreement, have received advice from independent counsel of their own choice regarding the Agreement, have signed this Agreement freely and without duress, and have full authority to execute this Agreement and to consummate the transactions contemplated by this Agreement.

**6. No Other Representations.** Other than as set forth in this Agreement, no party (nor any agent, employee, representative, or attorney of or for any party) has made any statement or representation to any other party regarding any fact relied on in entering into this Agreement, and no party is relying on any statement, representation or promise of any other party (or such party's agent, employee, representative or attorney) in executing this Agreement, or in reaching the settlement provided for herein, except as expressly stated in this Agreement. Further, Adlife and Defendants acknowledge that they have made such investigation of the facts and the law pertaining to the matters being settled as it and its attorneys deem necessary and each party therefore assumes any risk that its understanding of the facts and/or the law is incorrect or incomplete.

**7. Payment and Conditions.** Within ten (10) business days, Defendants shall pay to Adlife sixty thousand US Dollars (USD $60,000) in full and complete settlement of all claims between them related to the Photographs and any other photographs published in

Quality advertisements prior to or as of the Effective Date of this Agreement, including but not limited to those claims related to the Photographs that were or could have been asserted in the litigation, and in consideration for the release set forth herein. Payment should be made via check made payable to Liebowitz Law Firm, PLLC as counsel for Adlife Marketing & Communications Company, Inc. and mailed to Liebowitz Law Firm, PLLC, 11 Sunrise Plaza, Suite 305, Valley Stream, NY 11580. Adlife and/or its counsel shall provide a taxpayer identification number and any other information necessary for Defendants to process the payment in compliance with its tax obligations, including but not limited to a completed IRS W-9 form. Adlife will be solely responsible for any and all tax liabilities arising from or related to the payment.

**8. No Admission of Liability.**  This Agreement does not constitute an admission of liability by any party hereto, and may not be used for any purpose in any future litigation or other dispute resolution process, except in an action (and to the extent necessary) to enforce the terms of this Agreement. The parties further agree that the payment described in Paragraph 7 of this Agreement shall not be considered precedential or be used as evidence in any proceeding except a subsequent proceeding (and to the extent necessary) to enforce this Agreement.

**9. Joint Contribution and Drafting.**  Adlife and Defendants agree that they have had equal opportunity to review and contribute to the language and format of this Agreement. Therefore, this Agreement shall not be construed against any party on the basis that such party was the drafter.

**10. Previously-Incurred Legal Fees.**  Each party hereto shall pay its own costs and expenses, including legal fees, including, but not limited to, those incurred in negotiation, preparation and execution of this Agreement.

**11. Confidentiality.**  The terms of this Agreement are confidential; provided, however, that each party may disclose the terms of this Agreement, as necessary, to enforce its terms, in response to valid legal process, or as otherwise required by law (in which event, the disclosing party will notify the other party, unless prohibited, of the possible disclosure prior to the same and, to the extent possible, with sufficient time to enable the other party to object or seek other protection from such disclosure), and/or to its corporate officials, financial, tax and/or legal advisors, or insurers.

**12. Consideration.**  Adlife and Defendants expressly acknowledge and agree that this Agreement has been entered into in good faith in order to resolve the Claim. Adlife and Defendants expressly acknowledge that all terms of this Agreement are supported by good, valid and legally sufficient consideration so as to make this Agreement binding and valid.

**13. Severability.**  In the event that any term or provision of this Agreement is determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the remaining terms or provisions of this Agreement, which remaining terms and provisions shall remain in full force and effect.

**14. Counterparts.**  This Agreement may be executed in any number of separate counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one agreement, which shall be binding upon and effective as to all of the parties.  Signatures communicated electronically or by facsimile are permissible and enforceable.

**15. No Waiver.**  No waiver of any breach of any term or provision of this Agreement shall be construed to be, or shall be, a waiver of any other breach of this Agreement.  No waiver shall be binding unless in writing and signed by the party or parties waiving the breach.

**16. Section Headings.**  The paragraph, section and article headings used in this Agreement are intended solely for convenience and reference and shall not in any manner amend, limit, modify, or otherwise be used in the interpretation of any of the provisions of this Agreement.

**17. Successors.**  This Agreement, along with its terms and conditions, shall be binding on and shall inure to the benefit of each of the parties and to their heirs, executors, administrators, successors-in-interest and assigns.

**18. Integration.**  This Agreement constitutes and contains the entire settlement agreement of Adlife and Defendants with respect to the subject matter hereof, and there are no other agreements, understandings or representations with respect to this subject matter which are not expressly set forth herein.  The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms between the parties and that no extrinsic evidence may be introduced in a judicial proceeding involving this Agreement.

**19. Written, Signed Amendment Required.**  This Agreement may not be modified or amended except by written agreement, signed by Adlife and Defendants.

**20. Governing Law; Venue.**  This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina applicable to contracts to be wholly performed therein.  The exclusive forum for any disputes arising out of or relating to this Agreement shall be an appropriate state or federal court situated in Greenville County, South Carolina.

**22. Dismissal of Case.**  After Adlife's receipt of the settlement payment, the parties will file a joint stipulation of dismissal with the Court with prejudice as to all claims that were or could have been asserted in the action.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth opposite their respective signatures.

//

//

ADUBE MARKETING & COMMUNICATIONS COMPANY, INC.

By: _____

Joel M. Albrizio, President

Date: _____July 26, 2019_____


QUALITY FOODS OF ANDERSON, S.C., INC.

By: _____Verlin Reece_____

Name: ____Verlin Reece_____

Title: ____President_____

Date: _____July 31, 2019_____


GANNETT COMPANY, INC.

By: _____

Name: _____

Title: _____

Date: _____


MAINSTREET NEWSPAPERS, INC.

By: _____

Name: _____

Title: _____

Date: _____

ADLIFE MARKETING & COMMUNICATIONS COMPANY, INC.

By: _____
    John M. Fabrizio, President
Date: _____
         July 26, 2019


QUALITY FOODS OF ANDERSON, S.C., INC.

By: _____

Name: _____

Title: _____

Date: _____


GANNETT COMPANY, INC.

By: _____

Name: _____Thomas Curley_____

Title: ____Associate General Counsel_____

Date: _____July 29, 2019_____


MAINSTREET NEWSPAPERS, INC.

By: _____

Name: _____

Title: _____

Date: _____

ADLIFE MARKETING & COMMUNICATIONS COMPANY, INC.

By: _____

Date: _____


QUALITY FOODS OF ANDERSON, S.C., INC.

By: _____

Name: _____

Title: _____

Date: _____


GANNETT COMPANY, INC.

By: _____

Name: _____

Title: _____

Date: _____


MAINSTREET NEWSPAPERS, INC.

By: _Scott Buffin_

Name: _SCOTT BUFFINGTON_

Title: _Co-Publisher_

Date: _7/23/19_

EXHIBIT A

[Complaint, with exhibits, in *Adlife Marketing & Communications Company, Inc. vs. Quality Foods of Anderson, S.C., Inc.*, C.A. No.: 8:18-cv-01976-TMC (D.S.C.)]

# Exhibit "B"



# Quality Foods
## Infringements - Image Research

Infringements Found On Ads With Week Ending Dates:
October 08, 2020 - January 08, 2021

(6 **Timely** Infringements)



Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## COMMERCE QUALITY FOODS

### MAILING ADDRESS:

Commerce Quality Foods
PO Box 549
Commerca, GA 30529

### PHONE NUMBER:

706 335 5050



ChickenBreastBnls015_ADL
COPYRIGHT REGISTRATION NUMBER:
VA0002046891



January 08, 2021



Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## QUALITY FOODS OF GREER

### MAILING ADDRESS:

Quality Foods of Greer
508 North Main Street
Greer, SC 29651

### PHONE NUMBER:

964 877 4043



ClementinesHR0408
COPYRIGHT REGISTRATION NUMBER:
VA0002022602





Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## COMMERCE QUALITY FOODS

### MAILING ADDRESS:

Commerce Quality Foods
PO Box 549
Commerca, GA 30529

### PHONE NUMBER:

706 335 5050



PorkRibBabyBack006

COPYRIGHT REGISTRATION NUMBER:
VA0002020735





Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

---

# INFRINGEMENT DATA SHEET

---

## QUALITY FOODS OF ANDERSON

### MAILING ADDRESS:

Quality Foods of Anderson
207 Highway 29 By-Pass
Anderson, SC 29624

### PHONE NUMBER:

864 231 6539



PorkRibBabyBack006
COPYRIGHT REGISTRATION NUMBER:
VA0002020735



---

Contact: licensing@adlife.com

December 04, 2020



Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## QUALITY FOODS OF GREER

### MAILING ADDRESS:

Quality Foods of Greer
508 North Main Street
Greer, SC 29651

### PHONE NUMBER:

964 877 4043



PorkRibBabyBack006
COPYRIGHT REGISTRATION NUMBER:
VA0002020735





Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## COMMERCE QUALITY FOODS

### MAILING ADDRESS:

Commerce Quality Foods
PO Box 549
Commerca, GA 30529

### PHONE NUMBER:

706 335 5050



VineRipeTomatoes001_ADL
COPYRIGHT REGISTRATION NUMBER:
VA0002055118





# Exhibit "H"



---

## Quality Foods

---

**Beth McMillan** <beth.mcmillan@mgclaw.com>                                   Tue, Feb 9, 2021 at 2:23 PM
To: Ryan Carreon <rcarreon@higbeeassociates.com>

Ryan,

Sorry to be late in responding.  I got Shingles last week on Thursday and it has been way worse than Covid was for me.

My client is not involved at all in selecting the photos.  It gets them from Gannett.

Thanks,

Beth

[Quoted text hidden]

---



**Beth McMillan**, *Attorney*
beth.mcmillan@mgclaw.com
55 E. Camperdown Way Suite 300
Greenville, SC 29601
**Main:**864-239-4000 | **Direct:**864-239-4037 | **Fax:**864-242-3199
**VCARD | BIO**

---

This electronic mail may contain information that is confidential, attorney/client and/or work product privileged, prepared in anticipation of litigation and/or exempt from disclosure under applicable law. This transmission is intended solely for the individual or entity designated above. If you are not the intended recipient, you should understand that any distribution, copying, or use of the information is unauthorized and strictly prohibited. If you have received this electronic mail in error, please immediately notify the sender and destroy all copies which you may have of this communication.

Please consider the environment before printing this email.

# Exhibit "I"



Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## FAREWAY FOODS STORE 597

### MAILING ADDRESS:

Fareway Foods Store 597
105 East Adams Street
Creston, IA 50801

### PHONE NUMBER:

641 782 5612



IMAGE:
Hamburgers001_ADL
COPYRIGHT REGISTRATION NUMBER:
VA0002045012



Contact: licensing@adlife.com

February 01, 2019



Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## FAREWAY FOODS STORE 699

**MAILING ADDRESS:**

Fareway Foods Store 699
215 South Main Street
Osceola, IA 50213

**PHONE NUMBER:**

641 342 3884



IMAGE:
Hamburgers001_ADL
COPYRIGHT REGISTRATION NUMBER:
VA0002045012

**OSCEOLA**   **JANUARY 29- FEBRUARY 4, 2019** © 2019

# OUR "SUPER" DEALS WILL "BOWL" YOU OVER

NABISCO
**SNACK CRACKERS**



**$1 99**

7-10 OZ

**AVOCADOS**



**3/$1**

EACH

JACK'S ORIGINAL
**PIZZA**



LIMIT 3

**$1 77**

12 INCH

10 LB TUBES
**85% LEAN 15% FAT GROUND BEEF**



**$2 49**
LB.

SMALLER PACKS $2⁶⁹ LB

BUY 3 BAGS OF
**DORITOS**
($4.29 PP BAGS) FOR
**$1 88**

GET ONE
**PEPSI**
(24 PACK) FOR
**$2 99**
+ DEPOSIT



Contact: licensing@adlife.com

February 01, 2019



Adlife Marketing & Communications Co., Inc.
38 Church St • Pawtucket, RI 02860
Phone: (617) 530-0656

# INFRINGEMENT DATA SHEET

## FAREWAY FOODS STORE 989

### MAILING ADDRESS:

Fareway Foods Store 989
200 SE Laurel Street
Waukee, IA 50263

### PHONE NUMBER:

515 987 8073



IMAGE:
Hamburgers001_ADL
COPYRIGHT REGISTRATION NUMBER:
VA0002045012



February 01, 2019